

U.S. Department of Justice

BRUCE D. BRANDLER
Acting United States Attorney
Middle District of Pennsylvania
Website: www.justice.gov/usao/pam/
Email: usapam.contact@usdoj.gov

| | | |
|---|---|---|
| William J. Nealon Federal Building<br>235 N. Washington Avenue, Suite 311<br>P.O. Box 309<br>Scranton, PA  18503-0309<br>(570) 348-2800<br>FAX (570) 348-2037/348-2830 | Ronald Reagan Federal Building<br>228 Walnut Street, Suite 220<br>P.O. Box 11754<br>Harrisburg, PA  17108-1754<br>(717) 221-4482<br>FAX (717) 221-4493/221-2246 | Herman T. Schneebeli Federal Building<br>240 West Third Street, Suite 316<br>Williamsport, PA  17701-6465<br>(570) 326-1935<br>FAX (570) 326-7916 |

February 28, 2021

The Honorable Malachy E. Mannion
United States District Judge

  Re: *United States v. Eric Garman*, No. 3:19-CR-323

Dear Judge Mannion:

  I write concerning the sentencing hearing presently scheduled for defendant Eric Garman on March 1, 2021, and solely with respect to the issue of the appropriate award of "series" victim restitution to be ordered for the three victims who seek such restitution in this case. Please accept this letter in lieu of a more formal brief on the subject.

  The primary statute governing victim restitution in child pornography cases is 18 U.S.C. § 2259. This statute is applicable in any case where a defendant is "convicted of trafficking in child pornography." 18 U.S.C. § 2259(b)(2). The term "trafficking in child pornography" is specifically defined to include all of the major categories of child pornography offenses (i.e. possession, distribution, receipt and production), which are identified by code number in the text of the statute itself. § 2259(c)(3).

  In any such case, the statute instructs the Court to first determine the "full amount of the victim's losses" that were incurred or are reasonably projected to be incurred "as a result of the trafficking in

1

child pornography depicting the victim" (i.e. as a result of any of the unlawful conduct proscribed by the statutes listed in § 2259(c)(3)). § 2259(b)(2)(A). Then, with respect to the instant defendant, the court should order restitution "in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." § 2259(b)(2)(B).

Importantly, the plain language of the statute directs that this minimum award of $3000 issue to any victim whose image is depicted in the pornographic materials trafficked in by the instant defendant, regardless of whatever number the Court arrives at in its assessment of the full amount of the victim's losses (the analysis called for under § 2259(b)(2)(A)) and regardless of the Court's assessment of the particular defendant's relative role in causing that overall loss (the analysis called for under § 2259(b)(2)(B)).

The only limitation on this is that "[a] victim's total aggregate recovery…shall not exceed the full amount of the victim's demonstrated losses." § 2259(b)(2)(C).

The "full amount of the victim's losses" is given a detailed definition in the statute that specifically includes "any costs already incurred, or that are reasonably projected to be incurred in the future…as a proximate result" of all of trafficking in child pornography conduct involving the victim's image. § 2259(c)(2). The definition then specifically lists areas of recoverable loss, including the costs of medical and psychological care, physical therapy, transportation and temporary housing, lost income, reasonable attorney fees and costs and, finally, "any other relevant losses incurred by the victim." § 2259(c)(2)(A)-(F).

Having set forth the statutory scheme, the Government will now apply these principles to the three series victims seeking restitution in this case.

2

<u>"TARA"</u>

The victim impact statement provided by "Tara" is dated 9/20/2020 and the accompany itemized list of figures, titled "Tara – claims to restitution" includes notations for 2019 and 2020.  Therefore, the Court should take the "Tara" submission as a current and reasonably accurate assessment of both the victim's total losses and the monies that she has thus far received (her "total aggregate recovery") to offset those losses.

In her submission, "Tara" identifies her total unreimbursed loss as approximately $77,867.97.   Therefore, if the Court accepts her accounting, this is not a situation where the victim's total recovery exceeds her total losses.  Rather, this is a situation where the victim would be entitled to at least $3000 in payment from the instant defendant.

In reviewing the items which Tara identifies as bases for recovery, the most significant is the $123,620 that she attributes to "loss of housing due to stalkers/harassers 2012-2020."  The key question then becomes whether this loss was incurred as a proximate result of any of the trafficking in child pornography conduct involving her image that she has suffered over the years.

This is the key question because, if it is answered affirmatively, then the victim would at least be entitled to the minimum payment of $3000, regardless of whether or not any significant portion of this particular category of loss was a proximate result of this particular defendant's conduct.

The Government submits that the $123,620 loss that the victim suffered because she was "unable to live in [her] family home" is sufficiently proximate to be recoverable under the statute.  As the victim explains in her attached impact statement, she felt compelled to move out of the family home both due to the psychological trauma associated with living in the place where her original victimization occurred and because of vicious harassment that she suffered while still living there.

It strikes the Government as reasonably foreseeable that if a child is sexually assaulted and images of that assault are circulated widely on the Internet that the victim, her family and/or her family home might be identified by people in the community and become notorious and therefore the subject of the sorts of vicious harassment described by the victim.

It is equally foreseeable that this would cause the victim to have to vacate the home and "be forced to live with different people for [her] protection" and thereby accrue expenses that she would not have had to pay had she been able to live at peace in the family home.

Indeed, at least to a degree, this category of loss is specifically contemplated in the statute, which lists "temporary housing" among the specifically listed areas of recoverable loss.  § 2259(c)(2)(C).  This loss could also fall under "other relevant losses incurred by the victim."  § 2259(c)(2)(F).

Because this $123,620 loss is sufficiently proximate as to be recoverable, there is no calculation under which the victim's total recovery or reimbursement exceeds her total losses, and this court should order the instant defendant to pay at least $3000 in restitution to "Tara."

"JENNY"

The Court has reviewed the "Jenny" submission, which at 126 pages is reasonably thorough.  It includes a victim impact statement, a psychological report, and a letter calculating certain economic losses, which includes a document titled "Summary of Losses for Jenny," which is attached hereto, along with an email from counsel for "Jenny," for the Court's consideration.

As shown in the email, the attorneys representing "Jenny" place her total losses at $3,776,306, a figure that includes both an estimate of future lost wages and other losses that contribute to a final, overall loss figure titled in the Summary as "Loss of Enjoyment of Life."

As to the total aggregate recovery thus far for "Jenny," the email provided by counsel indicates that as of 03/31/2019 recovery for "Jenny" stood at only $113,861, a figure which is inclusive of attorneys fees and related expenses. When asked why this 2019 figure was the most recent available, counsel for "Jenny" explained that the system that the firm uses to process returns has been in the process of being overhauled.

Obviously, if the Court accepts the $3,776,306 figure as an accurate estimate of loss, even if we assume that "Jenny", who has been an identifiable victim since 2007, has continued to receive some restitution payments since March 2019, there is no question but that a significant amount of loss remains uncompensated.

However, even if we reject the $3,776,306 figure, and instead take the most conservative accounting of Jenny's losses, as set forth on the Summary exhibit, this remains true.

For example, if the Court entirely disregards the overall loss category titled Loss of Enjoyment of Life and focuses only on the much more readily quantifiable "loss of wages and benefits" <u>and</u> uses the most conservative assumptions for "net wages and benefits lost up to the age of 67," the amount of loss falls all the way down to $1,653,793. The Government submits that this figure is a more realistic estimate of Jenny's proximate losses resulting from her victimization, since there is no question that "lost income" is recoverable under the express terms of the statute. § 2259(c)(2)(D). And while lost wages into a person's 80s may not be reasonably proximate, lost wages into the middle 60s are.

Importantly, this more realistic loss figure is still a substantial loss that is not nearly covered by the $100,000 to $200,000 that "Jenny" has already collected.

Therefore, just as in the case of "Tara", this is not a situation where the victim's total recovery exceeds her total losses, and "Jenny" should likewise be awarded at least $3000 in restitution from the instant defendant.

5

"PIA"

The final victim to be considered is variously referred to in her counsel's submission as "Pia" and the "Sweet White Sugar" victim.

The "Pia" submission is also reasonably thorough and includes an attorney certification, a psychological report of the victim, and a victim impact statement submitted by the victim's mother. The psychological report projects lifetime mental health costs of $286,000 to $323,000. The attorney places her costs and expenses at approximately $25,000.

Admittedly, however, the "Pia" submission appears to be silent on the question of the amount of recovery already received to date.

Therefore, the Government will make all best efforts to ascertain that figure and provide documentation of that figure to the Court by the time of the sentencing hearing. If that figure is meaningfully less than $300,000, the Government will argue that, like "Tara" and "Jenny," "Pia" should be awarded at least $3,000 from the instant defendant, as she has identified reasonably proximate losses that are not less than the amount of aggregate recovery that she has thus far been awarded.

Respectfully submitted,

BRUCE D. BRANDLER
Acting United States Attorney

/s/ Jeffery St John
JEFFERY ST JOHN
Assistant United States Attorney

**St John, Jeffery (USAPAM)**

| | |
|---|---|
| From: | Fahimeh Zaheri <fahimehzaheri@marsh.law> |
| Sent: | Friday, February 26, 2021 11:37 AM |
| To: | Myers, Andrea (USAPAM) |
| Cc: | St John, Jeffery (USAPAM); Margaret E. Mabie; Natalie Smith; Restitution Group |
| Subject: | US v. Eric Garman Case Number 2019R00434 and Court Docket Number 19-CR-00323 |

Dear Andrea,

Thank you for your time, today, it was very nice talking to you. Our client **Jenny** has received approximately $113,861 in restitution as of 3/31/2019. Please note that these figures are inclusive of any attorney's fees and expenses. Also, we confirm that Jenny did not recover her total losses yet, which are $3,776,306 (this number is included in her restitution material).

Please feel free to let us know if you need any addition information. Thank you for all your hard work on behalf of all victims.

Please take care and stay safe.

Best,
Fahimeh

*Fahimeh Zaheri*
*Marsh Law Firm PLLC*
*Direct Dial 332-228-2344*
*(she, her, hers)*



**CONFIDENTIALITY NOTICE:** The information contained in this message and any attachment is confidential and may be subject to the attorney-client privilege, or otherwise protected from disclosure by applicable law. Any disclosure, distribution, copying, or use of the information contained in this message or any attachment by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system.
**IF YOU ARE NOT A CLIENT:** This material is general information of an educational nature and is not legal advice. This communication does not establish or constitute the retention of Marsh Law Firm PLLC for the provision of legal services, unless explicitly so stated herein. Any attached items, including the content of this e-mail, are offered "as is" with no guarantee as to their accuracy, timeliness, or completeness.

1

# SEG

## SUMMARY OF LOSSES FOR JENNY

| TABLE | DESCRIPTION | ESTIMATE |
|---|---|---|
| | **EARNINGS** | |
| 3 | LOSS OF WAGES & BENEFITS | |
| 6 | Scenario 1 to age 67 | $3,566,921 |
| | Scenario 2 to age 67 | $2,318,287 |
| 9 | OFFSET OF WAGES & BENEFITS | |
| | Annual Employment to age 67 | ($ 664,494) |
| (3-9) | NET WAGES & BENEFITS LOSS | |
| (6-9) | Scenario 1 to age 67 | $2,902,427 |
| | Scenario 2 to age 67 | $1,653,793 |

---

**PRESENT VALUE OF FUTURE TREATMENT**

| 10 | COST OF FUTURE TREATMENT | |
|---|---|---|
| | See Page 6 | $ 100,179 |

---

**LOSS OF ENJOYMENT OF LIFE**

| 13 | REDUCTION IN VALUE OF LIFE | |
|---|---|---|
| 16 | Lower impairment rating | $1,888,153 |
| | Upper impairment rating | $3,776,306 |

The information on this Summary of Losses is intended to summarize losses under certain given assumptions. Please refer to the report and the tables for all the opinions.

17

Smith Economics Group, Ltd. • *312-943-1551*